GLADNEY, Judge.
Union Producing Company, A. J. Hodges Industries, Inc. and Douglas Whitaker, the defendants-appellants herein, seek reversal of a judgment ordering the cancellation of two oil, gas and mineral leases on certain lands situated in Claiborne Parish, Louisiana. This action was brought by J. C. Le-Sage, who acquired from appellants’ lessors mineral interests affecting the lands included in the leases involved in this legal controversy. The plaintiff, J. C. LeSage, died during the pendency of the suit and his widow, Mrs. Avalyn Taylor LeSage, and. his sole heir, J. C. LeSage, Jr., have become substituted parties.
Prior to its decision of the case, the trial court overruled exceptions of no cause of action, no right of action, and non-joinder of indispensable parties. With reservations of their rights to the exceptions, which are reurged upon this appeal, the defendants answered and the case was tried upon the merits. The record as presented to this court contains all factual information necessary to a proper judicial determination of the dispute between the parties litigant. We find the evidence is not in the least conflicting and all salient facts have been determined.
Union Producing Company and A. J. Hodges Industries, Inc. acquired an oil, gas and mineral lease from Mrs. Avice Byrd,[1] as lessor, the lease having a primary term of six years from March 22, 1956. Another lease was obtained by the same lessees from Leonard Byrd,[2] as lessor, with a primary term of six years from March 21, 1956.
*780 On April 2, 1962, Mrs. Avice Byrd conveyed to J. C. LeSage one-half of the mineral rights on and under the property described in the lease to Union and Hodges and on April 4, 1962, Leonard Byrd granted to J. C. LeSage an oil, gas and mineral lease on the identical land described in his lease to Union and Hodges.
Effective as of January 1, 1959, the Commissioner of Conservation of the State of Louisiana by Order No. 23-C dated December 8, 1958, created a drilling and production unit for the “D” Sand of the Cotton Valley Formation underlying the Sugar Creek Field, Claiborne Parish, which unit consisted of all of Section 18, Township 19 North, Range 5 West. The tracts of land covered by the leases in contest were embraced in this unit.
Douglas Whitaker, having entered into a farm-out agreement with Union and Hodges including the two oil, gas and mineral leases in question, and having made a location meeting the requirements of Order 23-C of the Conservation Department, on December 15, 1962, commenced the drilling of a well, designated as the W. J. Byrd Estate Well, which well was not located on either of the above referred to leases but was on another separately owned tract of land within the “D” Sand unit. The well was drilled to a total depth of 8,066 feet, a depth sufficient to encounter and penetrate the “D” Sand, and other sands of the Cotton Valley Formation. The geological sequence of the Cotton Valley sands encountered in the W. J. Byrd Estate Well from shallowest to deepest were: “B" Sand, "D” Sand, Bodcaw Sand, Vaughan Sand, and McFearin Sand. Completed March 10, 1962, the well was capable of producing gas and condensate in commercial quantities in the perforated gamma ray log intervals between 7,686 feet to 7,693 feet and in the perforated electric log intervals between 8,00314 feet to 8,00854 feet below the surface of the earth. Following application made March 15, 1962, the Commissioner of * Conservation issued Order No. 23-J, effective May 1, 1962, which established special rules and regulations for the McFearin Sand. A spacing pattern was fixed on the basis of one well to a regular governmental section of 640 acres and Section 18, Township 19 North, Range 5 West, was designated as a drilling and production unit with provision for integrating the separately owned tracts in the unitized area for that particular sand. The order provided: “Not more than one well on each unit shall be allowed to produce from the McFearin Sand of the Cotton Valley Formation of the Sugar Creek Field.”
On June 13, 1962 application was made by Whitaker to produce the well as a dual gas well from the “D” Sand from 7,686-7,698 feet, and from the McFearin Sand from 8,003-8,008 feet. As a result of opposition by appellees, the Commissioner of Conservation fixed a hearing which was held on July 31, 1962, at which the opponents took the position that the sand perforated between the depths of 7,686 to 7,693 feet and labeled by the applicant as “D” Cotton Valley Sand was not in fact Cotton Valley “D” Sand but was Cotton Valley “B” Sand. Geological and engineering data and testimony established beyond any reasonable doubt that the appellees were correct in their position. The evidence also disclosed without contradiction that the second sand of the Cotton Valley Formation as encountered in the well was the “D” Sand identified from a core taken and examined on January 31, 1962. This sand was found to be not commercially productive and thereafter drilling continued to ultimate completion in the “B” and McFearin Sands with no further effort being made to secure commercial production from the “D” Sand zone. The Commissioner of Conservation issued Order No. 23-2, effective as of August 20, 1962, finding, inter alia, that the top sand reservoir of the Cotton Valley Formation penetrated in the W. J. Byrd Estate Well between intervals of 7,686 feet to 7,693 feet was not the same sand defined and recognized by the Department Order No. 23-C as the “D” Sand, but was in fact a sand defined as the “B” Sand of the Cot *781 ton Valley Formation. Authority was given in Order 23-2 for dual completion of the well from the “B” Sand and the Mc-Fearin Sand reservoirs of the Cotton Valley Formation.
Formal written demand was made on April 25, 1962 upon appellants for cancellation of tlie oil, gas and mineral leases in question herein for the stated reason that the primary terms of the two leases had expired on March 21 and March 22, 1962. The letter also advised that failure to comply with the request within ten days would impose penalties and damages. Following refusal by the appellants to grant the request this suit was instituted on July 23, 1962.
The petition of LeSage fully described the mineral interests owned by him and the leases under attack with specifications of the pertinent expiration dates and alleged entitlement to penalties and attorney’s fees. After interposing exceptions, which were overruled, defendants answered and affirmatively alleged that they were prevented from drilling on the leases in question by existing valid orders of the Department of Conservation; that said leases were included in a production unit under valid orders of the Department of Conservation for production from the Mc-Fearin Sand; and that the leases sought to be cancelled have been duly ratified and confirmed by the original lessors therein.
We are presented with a record of the case made up after trial of all issues between the parties which is complete in every respect. A decision upon the merits of the case will, therefore, serve to prevent additional delays and expenses without prejudice to the rights of the parties. Accordingly, we pretermit consideration of the exception of no cause of action. This is consistent with our jurisprudence and Code of Civil Procedure. Walker v. Rose Hill Amusement Co., Inc., La.App., 167 So. 144 (2nd Cir. 1936); Hingle v. Ahten, La.App., 43 So.2d 550 (Orl. Cir. 1950); D’avy v. Briggs, La.App., 28 So.2d 366 (1st Cir. 1946); LSA-C.C.P. Art. 2164.
The exceptions of no right of action and nonjoinder of indispensable parties, it is argued, must be sustained upon the grounds set forth in Reagan v. Murphy, 235 La. 529, 105 So.2d 210 (1958) and the authorities referred to therein. LSA-C. C.P. Art. 3664, enacted after that decision, appears to dispose of the contentions of exceptors. The Article reads:
“A mineral lessee or sublessee, owner of a mineral interest in immovable property, owner of a mineral royalty, or of any right under or obligation resulting from a contract to reduce oil, gas, and other minerals to possession, is the owner of a real right. These rights may be asserted, protected, and defended in the same manner as the ownership or possession of immovable property, and without the concurrence, joinder, or consent of the owner of the land.”
Also pertinent are the Official Revision Comments which we quote in full:
“(a) The above article was included in this Chapter to show a clear and unmistakable legislative intent, despite any of the language of the majority opinion in Reagan v. Murphy, 105 So.2d 210 (La.1958), to permit the enforcement of any of the rights enumerated in the above article by the actions recognized in this Chapter.
“(b) There is no conflict between this article and Art. 3660, supra. A mineral lessee, sublessee, or owner of a mineral or royalty interest possesses both for himself and for the owner of the land.
“(c) R.S. 9:1105, which is both substantive and procedural, is not repealed.”
For the reasons so stated we hold that the exceptions are without merit.
The position taken by appellants is that the leases are still in force and effect under *782 the established facts, pointing out that the W. J. Byrd Estate Well, the drilling of which was commenced prior to the expiration dates of the two leases, was located on a drilling unit previously established by Order No. 23-C of the Department of Conservation for the “D” Sand; that the well was completed to produce from the “B” and McFearin Sands on March 10, 1962, and by reason thereof the leases were maintained in full force after March 10, 1962 under the sixty day drilling clause;[3] that such operations were not abandoned as to the “D” Sand until completion of the well in the McFearin and “B” Sands; and that while the leases were being maintained beyond the primary term under the sixty day drilling clause, the Commissioner of Conservation issued Order No. 23 — J, effective May 1, 1962, which included the leased lands in a unit on which was situated a well capable of producing gas in commercial quantities from the McFearin Sand.
The contention of appellees is that the W. J. Byrd Well was not located on either of the two leases in question and no well was ever drilled thereon; that the “D” Sand encountered in the Byrd Estate Well was found nonproductive on January 31, 1962 and abandoned on that date, and that accordingly the sixty day drilling clause which permitted lessee to commence further exploration for the “D” Sand ended on April 2, 1962; and that since the W. J. Byrd Well was ineffective insofar as the “D” Sand was concerned, Order No. 23-J for the McFearin Sand can have no effect upon the two leases in question.
The Commissioner of Conservation was vested with authority pursuant to Act 157 of 1940, LSA-R.S. 30:2 et seq., among other things, to regulate the conservation of oil and gas resources and to avoid the drilling of unnecessary wells by integrating in the drilling units the maximum area which he finds, as a fact, that one well can efficiently and economically drain. In the application of this law the courts have been called upon to give due regard not only to public interest but to contractual relations and individual and property rights as well. However, it is firmly established that individual and property rights and contractual relations must yield to a proper exercise of the police power; and it is in the light of this principle that such laws are recognized as constitutionally valid. Everett v. Phillips Petroleum Company, 218 La. 835, 51 So.2d 87 (1950), and cases cited therein; Smith v. Holt, 223 La. 821, 67 So.2d 93 (1953); Delatte v. Woods, 232 La. 341, 94 So.2d 281 (1957). Our courts have many times held that mineral leases are maintained beyond their primary terms by obtaining production in paying quantities from operations on units established by the Commissioner of Conservation embracing the leased tracts even though no drilling is conducted on the tracts themselves. Boddie v. Drewett, 229 La. 1017, 87 So.2d 516 (1956).
 The Commissioner of Conservation may not use the power granted to him to create drilling units except when supported by engineering and geological data. This is essential in order to prevent deprivation of property rights. In Wilcox v. Shell Oil Company, 226 La. 417, 76 So.2d 416 (1954) there was in force a compulsory pooling order establishing an 160 acre drilling unit for what was described as the FN and FV Sands. When the unit operator, after drilling to and *783 finding nonproductive the pooled FX and FV Sands, elected to complete a well in the FT Sand which had been encountered in drilling the unit well, the court held that production from the well in the unpooled FT Sand did not excuse payment of rentals on a lease of another tract of land, a portion of which was included in the pooled unit for the FX and FV Sands. The court observed that had the well been completed in the pooled sands the payment of rentals would have been excused under the other lease. Under the decision, therefore, it is clear that production from a nonpooled, or nonunitized stratum is not to be viewed as the equivalent of production from pooled or unitized premises. The W. J. Byrd Estate Well, therefore, must be considered a dry hole with respect to the Commissioner’s order No. 23-C applicable only to the “D” Sand.
We are impelled to disagree with the contention of appellants that the sixty day clause maintained the leases in force until May 1, 1962, the effective date of Order No. 23-J of the Department of Conservation, which unitized all of Section 18 for production from the McFearin Sand, forasmuch as appellants must be considered as having abandoned any production from the "D” Sand as of January 31, 1962. Further exploration for this sand under the sixty day clause required steps in this direction to be taken prior to April 2, 1962. With the advent of April 2, 1962, the sixty day drilling clause was no longer applicable and, therefore, the rights of appellants to continue their ownership of the subject leases were lost unless there was in effect prior to April 2, 1962, a valid order of the Commissioner of Conservation unitizing and integrating said leases for production from the “B” or the McFearin Sand. The record discloses such an order was not in effect until May 1, 1962. Accordingly, appellants were without authority to hold the leases in question and their rights therein expired.
Counsel has argued most earnestly that Caldwell v. Humble Oil & Refining Co., La.App., 155 So.2d 228 (2nd Cir. 1963), Harper v. Hudson Oil & Gas Company, 299 F.2d 238 (5th Cir. 1962), affirming 189 F.Supp. 781 (W.D.La., 1960), St. Louis Royalty Company v. Continental Oil Company, 193 F.2d 778 (5th. Cir. 1952), Stanolind Oil & Gas Co. v. Newman Bros. Drilling Company, 157 Tex. 489, 305 S.W.2d 169 (1957) have special application herein. We have carefully examined these authorities and are of the opinion that they are inapposite. In Caldwell v. Humble Oil & Refining Co., the order of the Department of Conservation unitizing a portion of the premises in dispute became effective while a well was actually being drilled on the premises in dispute. Although the unit well was on other land the order of uni-tization became effective while the lease in dispute was being maintained by the drilling clause after the end of the primary term. Likewise, in Harper v. Hudson Oil & Gas Company a well commenced on the leased premises prior to the primary term was abandoned as a dry hole two days after the end of the primary term. The lease provided for a sixty day extension if the lessee was engaged in drilling a well on the leased premises at the expiration of the primary term. Within the extension period the leased premises were unitized with other acreage upon which a producing well was located but after the abandonment of the well on the leased premises. As in the Caldwell v. Humble Oil & Refining Company and Harper v. Hudson Oil & Gas Company cases, St. Louis Royalty Company v. Continental Oil Company and Stanolind Oil & Gas Company v. Newman Brothers Drilling Company are distinguishable upon their peculiar facts. It is observed that in the instant case there was no drilling on the leased premises in dispute and the sixty day drilling clause expired subsequent to the primary term without prior effective uniti-zation of the lands involved.
 We take note of the allegations of appellants’ answer that they were prevented from drilling a well on the two *784 leases sought to he cancelled through existing orders of the Department of Conservation, and further, that the leases sought to he cancelled by appellants herein have been duly ratified and confirmed by the original lessors herein. The contentions are untenable. The force majeure clause is without application for the reason that appellants have not shown that they were prevented from or desired further exploration of the “D” Sand unit and Order 23-C of the Department of Conservation provides for such exceptional drilling. The second contention is likewise without validity. The record does not show that ratification or confirmation of the leases in question by the appellants’ lessors occurred prior to the acquisition of the rights of the appellees.
The trial court held under the provisions of LSA-R.S. 30:102 that appellants were entitled to attorney’s fees of $1,000. The statute which is quoted below has been held to be punitive in nature and must be strictly construed. Viator v. Haynesville Mercantile Company, 230 La. 132, 88 So.2d 1 (1956).
“Whenever an optional oil or gas lease shall lapse because of the termination of the full period within which it may be kept alive by the payment of rentals, or because of failure on the part of the lessee to comply with the condition for the prevention of forfeiture, the lessee shall within ten days after written demand on the part of the lessor furnish the lessor with an acknowledged instrument, directing the cancellation of the lease on the records.
“If a lessee, having been given written notice demanding cancellation of the lease, fails or refuses to comply within ten days, he shall be liable to the lessor for a reasonable attorney’s fee incurred by the lessor in bringing suit to have the cancellation adjudged. He shall also be liable to the lessor for all damages suffered by him by reason of his inability to make a lease because of the non-cancellation.” [LSA-R.S. 30:102]
As we interpret the statutory provisions, attorney’s fees may be claimed only by a litigant standing in the position of a lessor. Thus in the instant case appellees are not beneficiaries under the act. Furthermore, we observe proof has not been made that the attorney’s fees claimed have actually been paid, or an obligation incurred to pay, the absence of which proof defeats recovery. Melancon v. Texas Company, 230 La. 593, 89 So.2d 135 (1956); Sohio Petroleum Company v. Miller, 237 La. 1013, 112 So.2d 695 (1959). For the reasons so stated we conclude that the attorney’s fees were improvidently granted.
In accordance with our findings and holdings as hereinabove set forth the judgment from which defendants have appealed is affirmed except as amended by rejecting the demand of plaintiffs-appellees for attorney’s fees.
Therefore, it is ordered, adjudged and decreed that there be judgment herein in favor of plaintiffs, Mrs. Avalyn Taylor LeSage and Joseph C. LeSage, Jr., and against defendants, Union Producing Company, A. J. Hodges Industries, Inc. and Douglas Whitaker, ordering and decreeing that the hereinafter described oil, gas and mineral leases be cancelled and declared to be of no force and effect with respect to the mineral interests of said plaintiffs, their heirs, successors or assigns, from the date of expiration of the primary terms thereof, to-wit: Oil, gas and mineral lease granted by Mrs. Avice Byrd, as Lessor, to and in favor of Union Producing Company and A. J. Hodges Industries, Inc., as Lessee, dated February 2, 1957, and duly recorded in Conveyance Book 225, Page 106, Records of Claiborne Parish, Louisiana, covering and affecting the following described property, to-wit:
Northeast Quarter of Northeast Quarter (NE/4 of NE/4) of Section IS, Township 19 North, Range 5 West, Claiborne Parish, Louisiana.
*785 Oil, gas and mineral lease granted by-Leonard Byrd, as Lessor, to and in favor of Union Producing Company and A. J. Hodges Industries, Inc., as Lessees, dated February 2, 1957, and duly recorded in Conveyance Book 225, Page 103, Records of Claiborne Parish, Louisiana, covering and affecting the following described property, to-wit :
Northwest Quarter of Northeast Quarter (NW/4 of NE/4) of Section 18, Township 19 North, Range 5 West, LESS AND EXCEPT 4 acres in the Northwest corner thereof.
It is further ordered, adjudged and decreed that there be judgment in favor of plaintiffs and against defendants recognizing and decreeing plaintiffs to be the owners in indivisión of an undivided one-half (1/2) of all of the minerals and mineral rights on and under the following described property, to-wit:
Northeast Quarter of Northeast Quarter (NE/4 of NE/4) of Section 18, Township 19 North, Range 5 West, Claiborne Parish, Louisiana
and, decreeing that that certain mineral deed dated April 2, 1962, and recorded under Instrument No. 228,656 of the Conveyance Records of Claiborne Parish, Louisiana, whereby the said Mrs. Avice Byrd conveyed one-half of the mineral rights as aforesaid to J. C. LeSage, to be a valid conveyance of said mineral interest translative of title and effective as of the date of said conveyance.
It is further ordered, adjudged and decreed that there be judgment herein in favor of plaintiffs and against defendants decreeing the hereinafter described oil, gas and mineral lease to be the only valid and subsisting mineral lease affecting the property described therein as of the date of said oil, gas and mineral lease, to-wit: Oil, gas and mineral lease granted by Leonard Byrd, as Lessor, to J. C. LeSage, as Lessee, dated April 4, 1962, and recorded April 6, 1962, under Instrument No. 228,679, Conveyance Records of Claiborne Parish, Louisiana, covering and affecting the following described property, to-wit:
Northwest Quarter of Northeast Quarter (NW/4 of NE/4) of Section 18, Township 19 North, Range 5 West, Less and Except 4 acres in the Northwest corner thereof, Claiborne Parish, Louisiana.
As so amended the judgment is affirmed at appellants’ cost.
AYRES, J., dissents with written reasons.

. This lease, dated February 2, 1957, was recorded in Conveyance Book 225, page 106, records of Claiborne Parish, and affected the following described property:
Northeast Quarter of Northeast Quarter (NE/4 of NE/4) of Section 18, Township 19 North, Range 5 West, Claiborne Parish, Louisiana.

. This lease, dated March 21, 1956, was recorded in Conveyance Book 225, page 103, records of Claiborne Parish, and affected the following described property:
Northwest Quarter of Northeast Quarter (NW/4 of NE/4) of Section 18, Township 19 North, Range 5 West, LESS AND EXCEPT 4 acres in the Northwest corner thereof.

. The sixty day drilling; clause referred to, insofar as pertinent herein reads: “ * * * if a well be abandoned or production should cease within sixty (60) days prior to the expiration of the primary term Lessee commences actual drilling, mining or reworking operations hereunder in search of such products then this lease shall continue in force so long as such operations are being conducted in good faith without lapse of more than sixty (60) days between cessation of operations and their recommencement, whether on the same well or mine or on different wells or mines successively. * * *»